# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CC-01916-SCT

*PATRICIA A. SHERMAN*

*v.*

*MISSISSIPPI EMPLOYMENT SECURITY COMMISSION*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/03/2006 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN C. JOPLING |
| | JEREMY DAVID EISLER |
| ATTORNEY FOR APPELLEE: | ALBERT B. WHITE |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 08/28/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Following Hurricane Katrina, Patricia Sherman was, *inter alia*, instructed by her employer to charge and collect room rates greater than room rates charged before the storm. Soon thereafter, she quit her position as a motel desk clerk. Initially, Sherman was awarded unemployment benefits, but later the Board of Review for the Mississippi Department of Employment Security ("MDES") denied Sherman's claim. The Circuit Court of Jackson County, Mississippi, affirmed. From that ruling proceeds this appeal.

**FACTS AND PROCEDURAL HISTORY**

¶2.     On August 26, 2005, in anticipation of Hurricane Katrina making landfall, Governor Haley Barbour declared a state of emergency. At and before that time, Sherman was employed as a desk clerk at the Days Inn in Moss Point, Mississippi.[1] Prior to Hurricane Katrina, the room rate at the Days Inn was $45-50 per night. According to Mitesh Patel, the Days Inn manager, immediately after Hurricane Katrina hit, "the owners called me and told me to start charging the rack rate."[2] The "rack rate" was $90 per night. When Sherman voiced her concerns about this practice, Patel "told her we were charging our rack rate." Patel asserted that the "rack rate" was "set a year in advance" and that "there's eleven motels on the exit. They'll all tell you, if they can get the rack rate, that's what everybody's going to get is the rack rate." Thereafter, Sherman voluntarily quit her position because "[t]here was a lot going on there that I did not agree with.[3] . . . [I]n my opinion, I was breaking the law. I was just not treating people right[,]" as the Days Inn was engaging in alleged "price-

---

[1]Sherman had been in that position since March 2000.

[2]According to the Administrative Appeals Officer ("AAO"), "[r]ack rates are published maximum rates established annually by hotels and motels."

[3]Sherman also alleged that the motel double-rented its rooms, refused to honor Red Cross vouchers, refused to accept credit cards, and rented rooms that were unsuitable for habitation. However, the Days Inn disputed each of these fact issues, and the MDES found for the Days Inn. On such findings, this Court deems deference appropriate. *See* Miss. Code Ann. § 71-5-531 (reenacted under 2008 Miss. H.B. 1, Section 45) ("[i]n any judicial proceeding under this section, the findings of the Board of Review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law"). Accordingly, we address only the undisputed and case-dispositive question of law presented by the increased rates.

2

gouging."  According to Sherman, "I'm the one that's down there breaking the law.  I'm doing it because . . . the manager, said do it.  But, it's my name on them folios.  Not his."

¶3.    On October 16, 2005, Sherman filed a claim for unemployment benefits with the MDES.  On December 12, 2005, a claims examiner notified the Days Inn that Sherman was eligible for benefits.  Thereafter, the Days Inn appealed the determination of the claims examiner.

¶4.    On January 24, 2006, a telephonic hearing was held before an AAO.  Following examination of Sherman and Patel, the AAO concluded:

> I don't think that there's any dispute of record as to whether or not that prices prior to the hurricane are not the same prices that were charged for a room after the hurricane.  *There's no dispute about that*.  Both your testimony and the employer's testimony both state that that is the case.

(Emphasis added).    Nonetheless, the AAO reversed the claims examiner.    Following Sherman's subsequent appeal, the Board of Review "adopted the Findings of Fact and Opinion of the [AAO] and affirmed the decision."  Sherman appealed to the circuit court.[4]

---

[4]Attached to Sherman's notice of appeal was a June 30, 2006, letter opinion from Linda Coston Davis, Special Attorney General - Consumer Protection Division, to Sherman and MDES "regarding Mississippi's [p]rice [g]ouging [s]tatute at Ms. Sherman's request." According to Davis's letter opinion, under Mississippi Code Annotated Section 75-24-25(2):

> [o]nce a State of Emergency is declared, then prices shall not exceed the prices ordinarily charged at or immediately before the State of Emergency.  It is a common misconception among some innkeepers that they can charge their rack rate during a State of Emergency.  This is an incorrect belief.  The statute states they must continue to charge the price they ordinarily charged in the days immediately preceding the State of Emergency.  The State of Emergency was declared on 26 August 2005.  The determining questions are: What price did the motel/hotel charge on 25, 24, 23, 22 August 2005?  Did it exceed the price after 26 August 2005?  If the answer to the second question is "Yes" then price gouging likely occurred.

3

¶5.    On August 25, 2006, the circuit court entered an "Order Affirming Decision." Specifically, the circuit court found that the Board of Review's denial of Sherman's claim for unemployment benefits "is supported by substantial evidence, is not arbitrary or capricious, comports with established law and that the actions of [Sherman] constituted voluntarily leaving employment without good cause." Sherman subsequently filed a "Motion to Reconsider and/or Clarify Order" and a "Motion to Expunge Original Order; Motion to Enter Order that Comports with the Facts and Laws of this Cause." The motions were denied by the circuit court. From that ruling proceeds Sherman's appeal.

## ISSUE

¶6.    This Court will consider:

(1) Whether Sherman's refusal to engage in price-gouging following Hurricane Katrina constitutes good cause for voluntarily leaving her employment.

## STANDARD OF REVIEW

¶7.    "In any judicial proceeding under this section, the findings of the Board of Review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." Miss. Code Ann. § 71-5-531 (reenacted under 2008 Miss. H.B. 1, Section 45). This reflects this Court's:

obligation of deference to agency interpretation and practice in areas of administration by law committed to their responsibility. This duty of deference derives from our realization that the everyday experience of the administrative agency gives it familiarity with the particularities and nuances of the problems committed to its care which no court can hope to replicate.

---

There is no indication that this letter was considered by the circuit court, as it was never before the MDES, and this Court will not consider it either. *See **Skrmetta v. Bayview Yacht Club, Inc.***, 806 So. 2d 1120, 1127 (Miss. 2002).

4

*Dunn v. Miss. Dep't of Health*, 708 So. 2d 67, 72 (Miss. 1998) (quoting *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 593 (Miss. 1990)). However, "*where an administrative agency errs as a matter of law, courts of competent jurisdiction should not hesitate to intervene.*" *Grant Ctr. Hosp., Inc. v. Health Group of Jackson, Inc.*, 528 So. 2d 804, 808 (Miss. 1998) (emphasis added).

## ANALYSIS

¶8. "The underlying purpose of implementing employment security law in Mississippi is to protect those workers not permitted to continue employment through no fault of their own." *Broome v. Miss. Employment Sec. Comm'n*, 921 So. 2d 334, 337 (Miss. 2006) (quoting *Allen v. Miss. Employment Sec. Comm'n*, 639 So. 2d 904, 906 (Miss. 1994)). Accordingly, an individual is disqualified from receiving unemployment benefits if they "left work voluntarily without good cause . . . ." Miss. Code Ann. § 71-5-513(A)(1)(a) (reenacted under 2008 Miss. H.B. 1, Section 39). "The burden of proof of good cause for leaving work shall be on the claimant . . . ." Miss. Code Ann. § 71-5-513(A)(1)(c) (reenacted under 2008 Miss. H.B. 1, Section 39).

¶9. At the hearing, the AAO stated, "I don't think that there's any dispute of record as to whether or not that prices prior to the hurricane are not the same prices that were charged for a room after the hurricanes. *There's no dispute about that.*" (Emphasis added). As such, the AAO correctly recognized the pertinent, undisputed facts. The AAO then determined that Sherman:

> initiated her separation when she tendered her resignation. The claimant failed to do all she could do to protect her employment but chose to voluntarily leave this employment. The claimant has not shown good cause within the meaning

of the law for voluntarily leaving employment. The claimant has not shown continued employment with this employer would have been detrimental to her health, safety or morals.

In so concluding, the AAO correctly stated that Mississippi Code Annotated Section 71-5-513(A)(1)(a) "provides that an individual shall be disqualified for benefits if he left work voluntarily without *good cause*." (Emphasis added). The AAO erred, however, in considering whether "continued employment with this employer would have been detrimental to her health, safety or morals." Thus, the AAO applied the wrong law. "Health, safety and morals" is a factor to be considered in situations where an individual who is presently receiving unemployment benefits fails to "apply for available suitable work . . . , to accept available suitable work when offered him, or to return to his customary self-employment[,]" after being so directed by the employment office or MDES. Miss. Code Ann. § 71-5-513(A)(3)(a) (reenacted under 2008 Miss. H.B. 1, Section 39). Such was simply not the situation in the case *sub judice*, as Sherman was applying for unemployment benefits.

¶10.     Mississippi Code Annotated Section 75-24-25(2) provides:

> [w]henever, under the Mississippi Emergency Management Law, Sections 33-15-1 through 33-15-49, a state of emergency or a local emergency is declared to exist in this state, then *the value received for all goods and services sold within the designated emergency impact area shall not exceed the prices ordinarily charged for comparable goods or services in the market area at or immediately before the declaration of a state of emergency or local emergency*. However, the value received may include: any expenses, the cost of the goods and services which are necessarily incurred in procuring such goods and services during a state of emergency or local emergency.[5]

---

[5]The record is void of any claim by Days Inn that they incurred additional operating expenses.

Miss. Code Ann. § 75-24-25(2) (Rev. 2002) (emphasis added). "*Any person* who knowingly and willfully violates subsection (2)[,]" may be subject to substantial fine and/or imprisonment. Miss. Code Ann. § 75-24-25(3) & (4) (Rev. 2002) (emphasis added). Therefore, the AAO, affirmed by the Board of Review and circuit court, applied the wrong law to undisputed facts. In short, there was no legal basis for the conclusion that Sherman "has not shown good cause . . . for voluntarily leaving employment." We find unemployment benefit claimants satisfy their "burden of proof of good cause for leaving work[,]" Miss. Code Ann. § 71-5-513(A)(1)(c) (reenacted under 2008 Miss. H.B. 1, Section 39), when they voluntarily leave employment rather than violate a statute, which is a question of law. Here, Sherman rejected instructions to commit an act in violation of Mississippi Code Annotated Section 75-24-25(2). Given these facts, and applying the correct law, this Court finds that the AAO, the Board of Review, and the circuit court erred in rejecting the determination of the claims examiner that Sherman was entitled to unemployment benefits. An employee meets the "burden of proof of good cause for leaving work," Miss. Code Ann. § 71-5-513(A)(1)(c) (reenacted under 2008 Miss. H.B. 1, Section 39), when he or she refuses to engage in conduct that is illegal as a matter of law.[6]

¶11. The issue in this case is solved by answering the question of law, and should require no further comment. Notwithstanding the narrowness of the issue before this Court, the separate opinion falls into the wake of the inapplicable, tangential voyage taken by the AAO

---

[6]The separate opinion errs in referring to this as a "new standard[.]" The statutorily-enacted standard is that of "good cause." *See* Miss. Code Ann. § 71-5-513(A)(1). This Court merely applies the correct law to the present set of facts in reaching the above-referenced conclusion.

in its decision, as well as the briefs filed on appeal, by unnecessarily addressing "health, safety and morals." Miss. Code Ann. § 71-5-513(A)(3)(a). Following this mistaken and illusory path, the separate opinion offers an untenable solution fraught with unintended consequences.

¶12. The separate opinion advocates an unnecessarily broad new standard that "as long as an employee has a *reasonable, objective belief* that she is required to engage in conduct that presents a risk to her health, safety or morals, she has 'good cause' voluntarily to leave her employment under Mississippi's employment security law." (Emphasis added). The advocacy of this standard is uncalled for as the increased-rate question of law is dispositive, and the errant "health, safety and morals" provision does not apply in this case.

¶13. The application of a "belief" standard of what may be legal or illegal is fraught with error and confusion, and is not necessary for the disposition of this controversy. The error in such a standard is apparent in this case. Specifically, the Days Inn "believed" that it was permissible to raise rates. The agency, however, is controlled by what "is" the law, not what the law is "believed" to be. A "belief" as to legality cannot be the standard, tossed to the four winds by the wishes and whims of employees or employers alike. Legality rests with the Legislature to create and courts to interpret. For example, is gambling or the consumption of alcoholic beverages illegal? It depends upon the county in which one lives. How could this Court permit recovery of unemployment benefits on the basis of such a transient concept as the employee's opinion when, as a matter of law, there is no legal basis in fact to support the opinion or "belief?"

8

¶14. Moreover, application of a "belief" or opinion standard interwoven into matters of morality will create untold numbers of circumstances in which neither the employee or employer will have a definitive standard to rely upon. MDES easily could be presented with a case in the future involving an employee voluntarily leaving employment solely on the basis of "risk . . . to his . . . morals[.]" Miss. Code Ann. § 71-5-513(A)(3)(a). Such vagueness may justify legislative reconsideration in the interest of clarity and fairness to employers and employees, but also clearly warrants avoidance by this Court of interpreting a provision of law not properly before us and creating a "belief" standard. For instance, can a server who believes that the consumption of alcohol is immoral be entitled to collect benefits after voluntarily quitting a job at a restaurant which did not serve alcohol when the server began employment, but now serves alcohol? Can power plant employees who conjure that a company is "immorally" contributing to global warming be entitled to voluntarily quit their jobs and collect benefits? Or what if thousands of shipyard workers suddenly decide the wars in Iraq and Afghanistan are illegal and immoral? Will the agency be required to assess whether such "beliefs" require the payment of unemployment benefits? Fortunately, this is a voyage we are not required or inclined to take at this time.

## CONCLUSION

¶15. Based upon the aforementioned analysis, the order of the Circuit Court of Jackson County affirming the decision of the Board of Review is reversed and judgment is rendered granting Sherman unemployment benefits.

¶16. **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. DIAZ, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J., AND IN PART BY EASLEY, J.**

**DIAZ, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶17. I must first note that the price gouging alleged in this case is particularly disturbing in light of the horrific aftermath of the worst natural disaster in United States history. Entire homes were reduced to slabs, leaving the citizens of the Gulf Coast scrambling for shelter. For a business to take advantage of these persons for pure financial gain, while they were at their most vulnerable, is deplorable.

¶18. With this in mind, the circumstances of the present case are, at the very least, unsettling, and I wholeheartedly agree that Ms. Sherman has demonstrated "good cause" for voluntarily leaving her employment. However, I cannot join today's opinion. First, the new legal standard announced in today's opinion places too heavy of a burden on the claimant and one that has not been met in this case. Second, in contrast to the majority's holding to the contrary, the unemployment statute *does* require us to consider the risk to the employee's "health, safety, or morals." Third, although the majority fails to address Ms. Sherman's argument that she had "good cause" to quit because her employer engaged in other morally questionable behavior, I find that her moral objections also entitle her to benefits.

**I.**

¶19. The new standard announced by the majority requires an employee to demonstrate refusal "to engage in conduct that is *illegal as a matter of law*" (emphasis supplied). Interestingly, this is the same standard that the MDES used to argue that Sherman was

10

*not* entitled to benefits. I agree with Sherman's response that requiring the employee to show actual wrongdoing places too heavy of a burden on the employee, for unless the State were to successfully convict the employer, the employee could never prove that the activity was indeed illegal.

¶20. Despite the lack of a criminal conviction, or even a criminal indictment, the Court finds that the Days Inn engaged in criminal activity "as a matter of law." In other words, this Court has determined that every element of the crime of price gouging has been proven beyond a reasonable doubt, without a trial, and without allowing the Days Inn an opportunity to put on evidence in its defense. All that is left for this Court is to impose a sentence. Such a finding is unequivocally outside the jurisdiction of this Court – this is an appellate court, not one of original jurisdiction. ***White v. State***, 159 Miss. 207, 131 So. 96 (1930). *See also* Miss. Const. Art. 6 § 146 ("The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals and shall exercise no jurisdiction on matters other than those specifically provided by this Constitution or by general law.") Criminal charges are brought by the State, tried in the appropriate trial court, in front of a trial judge, with guilt or innocence determined by the finder of fact.

**II.**

¶21. The majority spends much of its opinion attempting to explain how "health, safety and morals" is irrelevant to finding good cause. The proposed justifications misconstrue the "reasonable person standard," and by refusing to acknowledge that this Court has employed this same standard in previous unemployment cases regarding denial of benefits, the majority creates a new standard. ***Hoerner Boxes, Inc. v. Miss. Employment Sec. Comm'n***, 693 So.

11

2d 1343 (Miss. 1997) and *Huckabee v. Miss. Employment Sec. Comm'n*, 735 So. 2d 390, 397 (Miss. 1999). The majority simply concludes that Sherman has demonstrated "good cause" without any discussion of what the term means, and I cannot accept this oversimplified analysis.

¶22. Though it appears that the majority finds otherwise, there is simply no "plain meaning" to the phrase "good cause." When we are faced with such ambiguous and vague terms, this Court must attempt to determine the legislative intent and cannot apply whatever interpretation it wishes. By refusing to look to the entire statute, today's approach is contrary to our "constitutional mandate of deference to the Legislature." *City of Ellisville v. Richardson*, 913 So. 2d 973, 983 (Miss. 2005).

¶23. As we have repeatedly held, when the meaning of a statute is not readily apparent from the text, this Court turns to the rules of statutory interpretation. *Davis v. State*, 806 So. 2d 1098, 1101 (Miss. 2001). "The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein." *Clark v. State*, 381 So. 2d 1046, 1048 (Miss. 1980)).

¶24. Mississippi Code Section 71-5-513 does not define "good cause." However, the same statute includes provisions for determining the suitability of work. Miss. Code Ann. § 71-5-513(A)(1)(c) and (A)(3)(a)(Rev. 2000). These factors include "the degree of risk involved to [the employee's] health, safety and morals." Miss. Code Ann. § 71-5-513(A)(3)(a). The suitability of available work and an employee's reasons for voluntarily leaving her job are undeniably analogous. Thus, by looking at a corresponding subsection, we can determine

12

that "good cause" would include those situations where an employee voluntarily leaves because the job poses a significant risk to her "health, safety and morals."

¶25.    Our society has determined what is acceptable behavior, and we have set parameters in the form of criminal statutes. Conduct contrary to law certainly can be considered contrary to a person's morals.  With this in mind, the ultimate question in this case is whether Sherman had "good cause" to quit when she was asked to engage in behavior that presented a significant risk to her morals.

¶26.    Very few jurisdictions have considered this particular issue, but the majority of these states have concluded that an employee need only have a reasonable belief that her job requires conduct contrary to law or morality in order to have "good cause" to quit.  *See* Roderick D. Eves, *Eligibility for Unemployment Compensation as Affected by Claimant's Voluntary Separation or Refusal to Work Alleging that the Work is Illegal or Immoral*, 41 A.L.R.5th 123 (1996).

¶27.    In *O'Brien v. Employment Appeal Board*, 494 N.W.2d 660 (Iowa 1993), an employee voluntarily left his job because his employer required him to engage in activities which he considered illegal and unethical.  These activities included fraudulent sales, internal thefts, and various violations of the Environmental Protection Agency's regulations.  *Id.* at 661. The state's Employment Appeal Board rejected the employee's claims for benefits because he had not proven that his employer had violated the law.  *Id.* at 662.  The Iowa Supreme Court held that the proper inquiry was "whether a person of reasonable prudence would believe, under the circumstances faced by [the employee], that improper or illegal activities were occurring at [the workplace] that necessitated his quitting." *Id.*  The court reversed and

13

remanded the case with directions to make findings of fact using the proper legal standard. *Id.*

¶28.     In *Pascarelli v. Unemployment Appeals Commission*, 664 So. 2d 1089 (Fla. 5th Dist. App. 1995), a truck driver refused to drive a wide-load on a particular highway during rush hour believing that the conduct was illegal. *Id.* at 1090. Although the employer testified that the activity was permitted, the court held that "the dispositive question is whether it was unreasonable for [the employee] to refuse to make the trip even though it actually may have been legal to do so." *Id.* at 1093. The court found that it was not unreasonable for the employee to conclude that his route was illegal, and therefore, he was entitled to unemployment benefits. *Id.*

¶29.     In *Tom Tobin Wholesale v. Unemployment Compensation Board of Review*, 600 A.2d 680 (Pa. Cmmw. 1991), a computer analyst quit his job after he was asked to alter a computer program for illegal purposes. The court found that the employee had good cause to quit even though no illegal activity had taken place. *Id.* at 682. The court held that "the actual performance of the act is not required for an employee to sever the employment relationship." *Id.* (citing *Zinman v. Unempl. Compen. Bd. of Rev.*, 305 A.2d 380 (Pa. Cmmw. 1973)). The opinion went on to say that "[i]f Claimant had a reasonable belief that he was participating in an illegal activity or if his personal and professional integrity were so jeopardized by the circumstances, there can be a necessitous and compelling cause to terminate his employment." *Id.* at 683 (citing *Richner v. Unempl. Compen. Bd. of Rev.*, 505 A.2d 1375 (Pa. Cmmw. 1986)).

14

¶30.    The Supreme Court of Kentucky also found that an objective belief in the illegality of the conduct satisfies the requirement of "good cause."  In *Cobb v. King Kwik Minit Market, Inc.*, 675 S.W.2d 386 (Ky. 1984), the employee voluntarily left his job after he was asked to implement a "fast cash" game to promote sales.  *Id.* at 387.  The employee was advised by the state's Alcoholic Beverage Control office that the game would be illegal, but the employer assured him that the store could participate legally in the game.  *Id.* at 387-88. The court found that because "the claimants obeyed what they perceived to be a lawful command by a state agency," they were entitled to unemployment benefits.  *Id.* at 388.  The court also noted, "[i]t is fundamentally unsound to hold that the ordinary citizen elects to follow the directives of a state agency at his own risk and forfeits statutory rights to unemployment benefits if the acts in question are not subsequently found illegal by court order."  *Id.* at 389.

¶31.    As the above cases demonstrate, the general rule is that as long as an employee has a reasonable belief that she is required to engage in conduct that is illegal or immoral, she has "good cause" to leave her employment voluntarily.  *Accord Munger v. Indus. Comm'n of Utah*, 716 P.2d 808, 809-10 (Utah 1986) ("An employee can establish good cause for quitting if the conditions which cause him or her to quit are 'caused by external pressure so compelling that a reasonably prudent person, exercising ordinary common sense and prudence, would be justified in quitting.'" (quoting *Denby v. Bd. of Rev. Of Indus. Comm'n*, 567 P.2d 626, 630 (Utah 1977)); *Young v. Scott*, 442 S.E.2d 768, 770 (Ga. Ct. App. 1994) (noting that the Georgia Department of Labor regulations require a "reasonable person" standard to voluntary resignations); *Taylor v. Ohio Unempl. Compen. Bd. of Rev.*, 601

15

N.E.2d 670, 671 (Ohio Ct. App. 1991) (defining "just cause" as "conduct which a person of ordinary intelligence would consider to be a justifiable reason for terminating employment"); *Zinman*, 605 A.2d at 382 ("The employee who voluntarily terminates his employment may carry his burden of proving cause by demonstrating conduct comporting with ordinary common sense and prudence." (citing *Rosell Unemployment Compen. Case*, 135 A.2d 769 (Pa. Super. Ct. 1957))).[7]

¶32.    These cases are consistent with this Court's use of the "reasonable person" standard in employment security cases.  For example, in *Hoerner Boxes*, 693 So. 2d 1343, this Court found that an employee was entitled to employment benefits when she voluntarily left her employment due to repeated sexual harassment.  This Court held that "if an employee is sexually harassed to such a degree that an *ordinary prudent* employee would leave the ranks of the employed for the unemployed, then the employee should not be denied unemployment compensation benefits."  *Id.* at 1348 (emphasis supplied).  Similarly, in *Huckabee*, 735 So. 2d at 397 (Miss. 1999), the Court held that "an employee who leaves work under the belief that she has been fired has not voluntarily terminated her employment where that belief is *reasonable* under the circumstances"  (emphasis supplied).[8]

---

[7]One court has gone so far as to say that when an employer violates laws related to the public safety, an employee has good cause *per se* to quit at any time.  *Parnell v. River Bend Carriers, Inc.*, 484 N.W.2d 442, 445 (Minn. Ct. App. 1992).

[8]Both cases mention the idea of "constructive discharge," that is, "when the employer has made conditions so intolerable that the employee feels compelled to resign."  *Hoerner*, 693 So. 2d at 1347 (citing *Bulloch v. City of Pascagoula*, 574 So. 2d 637, 640 (Miss. 1990)). A discussion of constructive discharge is unnecessary.  The primary inquiry should be whether the employee reasonably believed that she was asked to engage in illegal or immoral activity.  *See* 8 Judge Leslie H. Southwick, Encyclopedia of Mississippi Law (Jeffrey Jackson and Mary Miller eds.) § 74:41 (2001) ("Whether someone left voluntarily

¶33. For these reasons, rather than saying that Sherman has demonstrated good cause just because this Court says so, I would adopt the position taken by other states – as long as an employee has a reasonable, objective belief that she is required to engage in conduct that presents a risk to her health, safety, or morals, she has "good cause" to leave her employment voluntarily under Mississippi's employment security law. From a public policy standpoint, this standard would protect those who refuse to engage in illegal activity. Requiring the employee to show actual wrongdoing, as the majority holds, places too heavy a burden on the employee. Of course, if the employee has been convicted of a crime, this would be a factor in determining whether the employee had a reasonable belief. However, it should not be a prerequisite to demonstrating good cause.

¶34. This standard does not, as the majority suggests, mandate a finding in favor of the claimant when there is no factual basis to support the employee's objective belief that she is facing a great risk to her morals. The majority's absurd examples would not withstand this objective analysis. Furthermore, the majority finds the word "morals" vague, but it is no more vague a term than "good cause." By asserting this, the majority concedes that it will not apply the statutory language of Section 71-5-513(A)(3)(a). The refusal to recognize and apply this subsection is directly contrary to the "strict constructionist" views to which many members of the majority purport to adhere.

**III.**

with good cause or was constructively discharged, may under unemployment compensation law not make much difference. Either category of departure will qualify a former employee for benefits.").

17

¶35. Regarding the merits of Sherman's claim, I agree that she has demonstrated good cause for leaving her employment, but not for the same reasons. Under the plain wording of the price-gouging statute, Sherman was justified in believing that doubling prices after the hurricane was in violation of this statute and that she could face criminal charges. Because her belief was reasonable, and not because the Days Inn broke the law, Sherman met her "burden of proof of good cause for leaving work," by demonstrating that she was faced with a significant "risk to [her] . . . morals." Miss. Code Ann. § 71-5-513(A)(1)(c) (Rev. 2000).

¶36. Sherman has argued that she also was required to engage in other immoral conduct, but, as stated before, the majority ignores this issue. Specifically, Sherman was concerned that the motel was double-renting its rooms, refusing to honor Red Cross vouchers, refusing to accept credit cards, and renting rooms that were unsuitable for habitation. Sherman notified her supervisor about these concerns as well, but to no avail.

¶37. MDES argues that Sherman's "ethical concern was that she may be lying; and her testimony did not indicate engagement in activities traditionally considered immoral, such as activities involving drugs, sex, alcohol, or minors." This argument is absurd. Sherman responds by pointing to one of the oldest and most referenced sources for moral guidance – the Ten Commandments, which prohibit "bear[ing] false witness." Exodus 20:16 and Deuteronomy 5:20. As one court put it, "[t]o lie is dishonest, immoral and unethical by all standards known to this court . . . . It should not be the purpose of the law to require people to lie to maintain a living." *Whipkey v. Ohio Bureau of Employment Servs.*, 635 N.E.2d 88, 91 (Ohio Misc. 1994). I agree that lying to customers, especially to those made homeless by

18

a natural disaster, is immoral conduct, and Sherman has demonstrated that she is entitled to benefits on this basis as well.

**GRAVES, J., JOINS THIS OPINION. EASLEY, J., JOINS THIS OPINION IN PART.**